Graffeo, J.
(dissenting). While I recognize the significance of the constitutional question raised in this action, the procedural issues before this Court must first be addressed, that is: whether plaintiff Sheldon Silver, as Speaker of the New York Assembly or as a Member of the Assembly, has the legal capacity or standing to bring an action challenging the Governor’s use of line-item vetoes in connection with certain budget bills passed by the Legislature. Because I disagree with the majority’s conclusion that plaintiff has such capacity or standing, I respectfully dissent and would affirm the dismissal of plaintiff’s complaint.
The sole cause of action asserted in the complaint is that, “[i]n complete contravention of the limitations on the Governor’s line-item veto authority as set forth in Article IV, § 7 of the Constitution, the Governor has unconstitutionally asserted a line-item veto to eliminate provisions in Non-Appropriation *543 Bills submitted and approved by both houses of the Legislature.” This contention is anchored in the constitutional tension which arises from the allocation of law-making and budgetary power between the Legislature and the Executive — a conflict involving two branches of State government. The complaint alleges no injury personal to plaintiff. Indeed, in his affidavit submitted in Supreme Court, plaintiff emphasized the institutional nature of his challenge. He asserted that, “[t]o allow legislative enactments that provide for the programming of executive appropriations to be dismantled piecemeal through the Governor’s exercise of the line-item veto would deprive the Legislature of that role,” complaining that “[t]he Governor’s exercise of the line-item veto has injected highly disruptive uncertainty into the Assembly’s decisions.” Additionally, plaintiff argued that the effect of the challenged vetoes was to diminish his political power as Speaker of the Assembly, indicating “the Governor’s exercise of the line-item veto with respect to non-appropriation bills has interfered with my authority as Speaker to negotiate the Assembly’s priorities and interests in the budget process.” Thus, although the majority has treated this controversy as one involving an individual legislator’s allegation of vote nullification, plaintiff’s claim is actually predicated on these alleged institutional injuries.
In determining capacity to sue under these circumstances, the requisite inquiry is whether an elected representative serving in one house of the Legislature possesses express or inherent authority to commence an action of this nature. An analysis of capacity to sue involves a litigant’s ability to initiate judicial review of a grievance. In Community Bd. 7 v Schaffer (84 NY2d 148, 155), this Court explained that capacity, a legal concept distinct from standing or justiciability, “concerns a litigant’s power to appear and bring its grievance before the court” which “sometimes depends purely upon a litigant’s status.” Capacity ensures that rights sought to be vindicated in court will be asserted by a party legally entitled to enforce such rights. Here, I find that this dispute essentially involves the extent to which powers are to be shared by the two branches of government in the development of the State budget and whether the Governor unlawfully disturbed the constitutional balance of power by exceeding his line-item veto authority with respect to particular budget legislation. I therefore conclude this is clearly an institutional claim.
There is no question that the State Legislature, the representative branch of government, can exercise only those pow *544 ers granted under the State Constitution, as further defined or implemented by statute. Indisputably, the scope of the Legislature’s powers is broad with respect to State legislative affairs (see, NY Const, art III, § 1), but neither the State Legislature, nor even the Assembly as an institution, is seeking redress here.
The majority’s discussion of capacity is focused on whether an individual legislator is vested with authority to challenge Executive action after passage of budget legislation. Certainly, there is no explicit constitutional pronouncement authorizing a legislator to commence such a lawsuit. Similarly, the Legislative Law, enacted to govern the affairs of the legislative branch (see, L 1909, ch 37), also provides no guidance since it primarily addresses the organization and administrative structure of the Legislature. And although article III, § 9 of the State Constitution permits each house to “determine the rules of its own proceedings,” the Rules of the Assembly for 1997-1998 contain no reference to the legal authority of a legislator to initiate litigation related to the performance of official duties or the protection of law-making functions.
Where, as here, there is no explicit authority to sue, the next step in capacity analysis is whether an inherent right has been or should be recognized which vests New York’s 211 State legislators with the authority to individually redress this type of institutional grievance. The majority finds such implied authority arising from the official’s general legislative duties and holds that a legislator’s vote on behalf of constituents would be rendered “meaningless” unless each legislator is vested with the capacity to prevent the nullification of his or her vote cast in support of the passage of a bill. Because plaintiffs claim is premised on an allegation that a “wrong” was committed against the collective will of the Assembly, I cannot adopt the majority’s viewpoint. In the absence of some collective authorization — either by statute, Assembly resolution or otherwise — there is no legal basis to find an individual legislator has the capacity to seek vindication for such alleged institutional harm.
Additionally, I conclude that plaintiff lacks standing as a Member of the Assembly to bring this action. In Matter of Posner v Rockefeller (26 NY2d 970), this Court held that three Members of the Assembly lacked standing to bring a suit challenging, on constitutional grounds, the validity of portions of appropriation bills. In addition to determining that plaintiffs lacked citizen-taxpayer standing (a ground not asserted in this *545 action), the Court held that their status as Members of the Assembly did not “give them the requisite standing to challenge in the judicial branch the validity of appropriation bills submitted by the Governor, and it matters not whether such bills have been passed by the Legislature or were still pending before that body at the time the proceeding was instituted” (id., at 971-972). Although the citizen-taxpayer standing analysis in Posner is no longer binding given the subsequent enactment of section 123-b of the State Finance Law, there is no reason to depart from that aspect of Posner most relevant to the issue before us — that a legislator lacks standing to commence litigation to resolve such a dispute.
I rely on the discussion of standing considerations in Society of Plastics Indus. v County of Suffolk (77 NY2d 761, 771-775) where this Court emphasized that the focus of a standing inquiry is whether the party bringing suit is the proper party to request the adjudication of a particular dispute. The pivotal concerns in a standing controversy are what type of injury is being asserted and by whom. Here, I find no basis for empowering plaintiff to redress what resonates as an institutional injury, particularly where he has not pursued this litigation under the color of a resolution authorizing him as Speaker of the Assembly to commence this action on behalf of that legislative body.
While this Court has recognized that the judiciary may “ ‘resolve disputes concerning the scope of that authority which is granted by the Constitution to the other two branches of the government’” (Matter of King v Cuomo, 81 NY2d 247, 251, quoting Saxton v Carey, 44 NY2d 545, 551), to date, this power has been exercised only when a legislator has been deprived of the ability to perform a legislative function or to enforce a constitutional obligation integral to his or her legislative duties (see, e.g., Anderson v Regan, 53 NY2d 356 [whether Legislature entitled to appropriate certain federal funds before disbursement]; Winner v Cuomo, 176 AD2d 60 [Governor’s failure to submit budget bills to Legislature within constitutionally prescribed time period]; Matter of Sullivan v Seibert, 70 AD2d 975 [failure of Executive agencies to comply with statutory requirement for the filing of annual reports with the Legislature]). There is no allegation in this case that the Executive took any action which prevented plaintiff from discharging his legislative duties as a Member of the Assembly. Insofar, as an allegation of vote nullification can be gleaned from this record, plaintiffs vote was no more “nullified” than it would be if a *546 majority of his Assembly colleagues had declined to vote with him, or if the Senate had not passed legislation for which he voted. What plaintiff has alleged is that the Governor improperly counteracted the cumulative actions of a majority of legislators by improperly vetoing legislation. The State Constitution, of course, provides a legislative means to address budgetary disagreements, granting the Legislature authority to override a gubernatorial veto (NY Const, art IV, § 7). In the same way a cumulative response is required for an override, any judicial challenge should involve the concurrent actions of legislators with the strength of a majority. To vest a sole member of a legislative house with the implied authority to initiate a challenge to redress an institutional injury suffered by the legislative body that passed particular legislation (and to conceivably allow the member to pursue that litigation at public expense), is to overlook fundamental principles of capacity and standing.
Coleman v Miller (307 US 433) does not direct otherwise. In 1925, the Kansas Senate adopted a resolution to ratify an amendment to the Federal Constitution by a 20-20 vote, with the Lieutenant Governor casting the deciding vote in favor of passage. Twenty State Senators commenced an action seeking a ruling prohibiting the Kansas Secretary of State from authenticating the resolution. The Supreme Court of Kansas denied the relief and the United States Supreme Court granted certiorari. On the issue of whether the state officials had a sufficient legal interest to establish standing, the Court concluded “that at least the twenty senators whose votes, if their contention were sustained, would have been sufficient to defeat the resolution ratifying the proposed constitutional amendment, have an interest in the controversy which, treated by the state court as a basis for entertaining and deciding the federal questions, is sufficient to give the Court jurisdiction to review that decision” (id., at 446). Those 20 Senators constituted a voting bloc; the action was not brought by one Senator purporting to vindicate the interests of the entire voting bloc.
More recently, the United States Supreme Court held in Raines v Byrd (521 US 811, 816) that six Members of Congress who voted against the Line Item Veto Act lacked standing to pursue a complaint alleging, in part, that the Act was unconstitutional because it “alter[ed] the legal and practical effect of all votes they may cast on bills containing such separately vetoable items.” In rejecting the claim of standing, the Court stated:
*547 “First, appellees have not been singled out for specially unfavorable treatment as opposed to other Members of their respective bodies. Their claim is that the Act causes a type of institutional injury (the diminution of legislative power), which necessarily damages all Members of Congress and both Houses of Congress equally. * * * Second, appellees do not claim that they have been deprived of something to which they personally are entitled— such as their seats as Members of Congress after their constituents had elected them. Rather, appellees’ claim of standing is based on a loss of political power, not loss of any private right, which would make the injury more concrete” (id., at 821 [emphasis in original]; see also, Clinton v City of New York, 524 US 417, 430).
The Court noted that the Coleman Court had “repeatedly emphasized that if these legislators (who were suing as a bloc) were correct on the merits, then their votes not to ratify the amendment were deprived of all validity” (Raines v Byrd, 521 US, at 822), and indicated Coleman stood “for the proposition that legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified” (id., at 823).
Here, plaintiff is a single legislator and he seeks to proceed in the absence of authorization from the Assembly to act on behalf of the voting bloc in that body. I would adopt a rationale similar to that of Raines: the usurpation of legislative authority alleged in the complaint represents an institutional harm and any vote nullification claim must be asserted by a sufficient voting bloc or by the institution itself.
Concluding plaintiff lacks capacity or standing as a Member of the Assembly, I would affirm the judgment dismissing the complaint.
Chief Judge Kaye and Judges Smith, Levine, Ciparick, Wesley and Rosenblatt concur in Per Curiam opinion; Judge Graffeo dissents and votes to affirm in a separate opinion.
Order modified, etc.